## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## DOTHAN DIVISION

| | | |
|---|---|---|
| **TRIP WHATLEY; SUSAN MOORE;** | ) | |
| **TRACY LENTZ; KEITH BOWERS;** | ) | |
| **and CHRIS NOONE;** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **1:19-cv-00040-ECM** |
| | ) | |
| **THE OHIO NATIONAL LIFE** | ) | |
| **INSURANCE COMPANY; OHIO** | ) | **JURY TRIAL DEMANDED** |
| **NATIONAL LIFE ASSURANCE** | ) | |
| **COMPANY; and OHIO NATIONAL** | ) | |
| **EQUITIES, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## FIRST AMENDED COMPLAINT

COME NOW Plaintiffs Trip Whatley, Susan Moore, Tracy Lentz, Keith Bowers, and Chris Noone (collectively, "Plaintiffs" or "Representatives") and hereby file their First Amended Complaint against Defendants Ohio National Life Insurance Company, Ohio National Life Assurance Company, and Ohio National Equities, Inc., pursuant to Rule 15(a) of the Federal Rules of Civil Procedure.

### I.  INTRODUCTION

1.      This action involves claims by Plaintiffs who are licensed sales representatives.   Plaintiffs assert claims against Ohio National Life Insurance

Company and its subsidiaries, Ohio National Life Assurance and Ohio National Equities, Inc. (collectively, "Ohio National" or "Defendants") for commissions which Ohio National is improperly and tortiously refusing to pay to Plaintiffs as alleged herein.

2.     As licensed sales representatives, Plaintiffs market through relationships with their broker-dealers.

3.     Ohio National entered into agreements known as "Selling Agreements" with numerous broker-dealers.  The Selling Agreements provided for the sale by the broker-dealers, through its affiliated sales representatives, including Plaintiffs, of various Ohio National annuity products.

4.     Plaintiffs Whatley, Moore, Lentz, Bowers, and Noone were intended third-party beneficiaries of these Selling Agreements, true and correct copies of which, along with their respective Commission Schedules and Addenda, are filed herewith and attached hereto as Exhibits A through E, respectively, and incorporated herein.[1]

5.     The Ohio National annuity products addressed by the Selling Agreements included variable annuities with a Guaranteed Minimum Income Benefit Rider (the "GMIB Rider").  The annuities with the GMIB Rider are hereafter

---

[1] Ohio National previously filed copies of these Selling Agreements along with their respective Commission Schedules and Addenda, in connection to their now-moot Motion to Dismiss Plaintiffs' original Complaint.  [Doc. 13-1].

referred to as the "GMIB Annuities" or "Annuities."

6.      The Plaintiffs sold these Annuities to their customers in Alabama, Georgia, and Mississippi, among other states.

7.      The customer premiums from the sales of these Annuities were paid directly to Ohio National.

8.      In return for promoting, selling, and servicing the Annuities, the broker-dealers and their affiliated sales representatives, including Plaintiffs, were entitled to receive commissions, as specified in the applicable Selling Agreements. These commissions included "trailing commissions."

9.      A "trailing commission" is compensation based on both the premiums paid by the customer and the earnings on those premiums.

10.      Trailing commissions were paid by Ohio National to broker-dealers and affiliated licensed sales representatives, including Plaintiffs, on an annual basis. Under the Selling Agreements, Ohio National is obligated to pay these commissions until the Annuities are either surrendered or annuitized.

11.      Under the terms of the applicable Selling Agreements, Ohio National had the right to discontinue <u>future</u> sales of new Annuities.  However, Ohio National did not have the right to unilaterally terminate its obligation to pay trailing commissions on existing Annuities.

12.      On September 28, 2018, Ohio National announced that it was

terminating the Selling Agreements with all broker-dealers with regard to the Annuities. As part of that termination, Ohio National also announced that it would no longer pay trailing commissions stemming from Annuities that were already in existence.

13.     Ohio National made this decision for the reason that it was losing substantial money on the GMIB Riders associated with these Annuities and was, therefore, willing to disregard its obligations under the Selling Agreements.

14.     Instead of paying trailing commissions to the broker-dealers and their sales representatives, including Plaintiffs, as required by the Selling Agreements, Ohio National has decided to simply pocket that money itself.

## II.     PARTIES

15.     Plaintiff Trip Whatley ("Whatley") is a resident of Dothan, Alabama and a citizen of the state of Alabama.  Plaintiff Whatley is a registered representative of ProEquities, Inc.

16.     Plaintiff Susan Moore ("Moore") is a resident of Pike Road, Alabama and a resident of the state of Alabama.  Plaintiff Moore is a registered representative of LPL Financial and, previously, of Raymond James.

17.     Plaintiff Tracy Lentz ("Lentz") is a resident of Decatur, Alabama and a citizen of the state of Alabama.  Plaintiff Lentz is a registered representative of Securities America.

18.     Plaintiff Keith Bowers ("Bowers") is a resident of Alpharetta, Georgia and a citizen of the state of Georgia.  Plaintiff Bowers is a registered representative of Next Financial Group.

19.     Plaintiff Chris Noone ("Noone") is a resident of Jackson, Mississippi and a citizen of the state of Mississippi.  Plaintiff Noone is a registered representative of LPL Financial.

20.     Defendant The Ohio National Life Insurance Company is an Ohio corporation with its principal place of business at One Financial Way, Cincinnati, Ohio 45242.

21.     Defendant Ohio National Life Assurance Company is an Ohio Corporation with its principal place of business at One Financial Way, Cincinnati, Ohio 45242. Ohio National Life Assurance Company is a subsidiary of The Ohio National Life Insurance Company.

22.     Defendant Ohio National Equities, Inc., is an Ohio corporation with its principal place of business at 237 William Howard Taft Road, Cincinnati, Ohio 45219. Ohio National Life Assurance Company is a subsidiary of The Ohio National Life Insurance Company.

## III.   JURISDICTION, VENUE, AND APPLICABLE LAW

23.     This Court has subject matter jurisdiction over Plaintiffs' claims based upon diversity of citizenship and the requisite amount in controversy pursuant to 28

U.S.C. 1332.  The claims of Plaintiffs, individually, substantially exceed the sum of $75,000.00, exclusive of interest and costs.

24.     This Court has general personal jurisdiction over Ohio National as to all Plaintiffs' claims, including those of non-resident Plaintiffs Bowers and Noone, because, as detailed below, at all relevant times, Ohio National has conducted substantial, continuous, and systematic business operations, and maintained business affiliations, throughout the state of Alabama, from which it derives substantial revenues.  Specifically, among other things, Ohio National has marketed and sold annuities and other insurance products in the state of Alabama on a systematic and regular basis, including the Annuities marketed by the resident Plaintiffs.

25.     Ohio National engaged, directly and indirectly, in activities, conduct, and affiliations within Alabama that were purposely directed at, and caused injury to, Alabama residents, including Plaintiffs Whatley, Moore, and Lentz. The claims at issue directly resulted from those activities.

26.     Venue is proper in this District under 28 U.S.C. § 1391 because Ohio National is subject to personal jurisdiction in this District and, therefore, resides in this District, and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

27.     The Selling Agreements select Ohio law to govern all disputes arising from the Selling Agreements.  The Plaintiffs are direct and intended third-party

beneficiaries of the Selling Agreements and, therefore, Ohio law applies to Plaintiffs' contract-based claims.

28. Plaintiffs' tort claims are governed by the laws of the state of their respective citizenship.

## IV. PERSONAL JURSIDICTION AS TO NON-RESIDENT PLAINTIFFS

29. As the United States Supreme Court explained in *Daimler AG v. Baeman,* 571 U.S. 117, 125 (2014), federal courts follow state law in determining the bounds of their jurisdiction.

30. Alabama state courts have long held that a business entity can be subject to general personal jurisdiction in this state if the entity has agents or employees present in the forum, is qualified to do business in the state, and has engaged in continuous and systematic business there. *See, e.g., Haney v. Floyd Healthcare Mgmt., Inc*. 2009 WL 10689512, at *1-2 (N.D. Ala. 2009) (citing *Leithead v. Banyan Corp*., 926 So.2d 1025, 1031 (Ala. 2005).

31. Ohio National is thus subject to general jurisdiction in the state of Alabama with regard to the claims of all Plaintiffs, including non-resident Plaintiffs Bowers and Noone, by virtue of Ohio National's continuous and systematic activities and affiliations within the state of Alabama, which render it essentially "at home" in Alabama such that it might reasonably anticipate being haled into court in this state. These continuous and systematic activities and affiliations include, but are

not limited to, the following:

      a.   Ohio National has maintained a continuous and systematic presence in the state of Alabama through its subsidiary, Ohio National Insurance Agency of Alabama, Inc. (the "Agency"). The Agency has been a continuously active Alabama domestic corporation since May 26, 1998, formed for the express purpose of selling Ohio National life insurance, valuable annuities, and related products, such as those addressed in the Selling Agreements at issue in this First Amended Complaint.

      b.   Ohio National has continuously and systematically sold annuity products through Alabama-based broker-dealers, including, but not limited to ProEquities, Inc., an Alabama domestic corporation based in Birmingham, Alabama, and formed July 11, 1984, and Sterne, Agee Investment Advisor Services, Inc., which was previously headquartered in Birmingham, Alabama, and subsequently acquired by SA Stone Investment Advisors, Inc., currently headquartered in Birmingham, Alabama.

      c.   The Ohio National entities have obtained certificates of authority to transact business within the state of Alabama and maintain registered agents in the state of Alabama.  Specifically, Ohio National

Life Insurance Company has been continuously qualified to transact business within the state of Alabama since at least May 25, 1978[2], and maintains a registered agent, Charles J. Anderson, for service of process at 104 Inverness Center Place, Ste. 215, Birmingham, Alabama 35242.

      d.     Ohio National Life Assurance Corporation has likewise been continuously qualified to transact business within the state of Alabama since September 21, 1979, and maintains the same registered agent, Charles J. Anderson, for service of process at 104 Inverness Center Place, Ste. 215, Birmingham, Alabama 35242.

      e.     In addition to the Annuities, Ohio National also directly, continuously, and systemically solicits, advertises, and markets life insurance and related products through sales representatives located in the state of Alabama to Alabama citizens.

      f.     In addition, Ohio National's website, which is available to Alabama businesses and consumers, advertises that its products are available nationwide (except in New York), including in Alabama. *See* http:www.ohionational.com/sites/public/default/ABOUT.

32.     Discovery is necessary to identify what Plaintiffs believe will be

---

[2] Ohio National Life Insurance Company previously qualified to do business within the state of Alabama as "Ohio National Life Ins Co." on May 23, 1933.

multiple additional Ohio National contacts with and business activities in the state of Alabama, including additional sales representatives.

33.     Ohio National, by carrying out such regular business transactions with Alabama businesses and consumers, purposely availed itself of the privilege of conducting business, and the attendant benefits and protections of the laws, of the state of Alabama, and may not avoid the consequences of suit here by the non-resident Plaintiffs.

## IV.   FACTUAL BACKGROUND

### A.     The Ohio National Variable Annuity with a Guaranteed Minimum Income Benefit Rider.

34.     A variable annuity is a contract sold by an insurance company under which the owner pays a lump sum premium to an insurance company, the insurance company purchases a portfolio of securities with those funds, and the owner then receives future payments based on the performance of the contract's underlying securities. The performance of these securities, usually mutual funds, dictates the size of the annuity payments to the insured or annuitant.

35.     In a "guaranteed minimum income benefit," or "GMIB" annuity, the annuity contract entitles the owner to receive a certain minimum level of payment monthly on the annuity, regardless of market performance or other factors.

36.     Ohio National sold GMIB Variable Annuities through multiple channels, including its own captive broker-dealer and its sales representatives, as

10

well as through many other broker-dealers and their affiliated sales representatives throughout the country.

37.     To facilitate those sales, Ohio National entered into Selling Agreements with broker-dealers (the "Selling Agreements").

38.     The Selling Agreements at issue in this litigation are substantively identical and contain standard boilerplate terms. *See* Exhs. A through E.  Each Ohio National Defendant is a party to these Selling Agreements. *Id.*   The Selling Agreements expressly provide for the commissions payable by Ohio National including trailing commissions.

39.     The Selling Agreements contemplate that broker-dealers would cause their sales representatives, including Plaintiffs, to perform the selling and servicing of the Annuities, as set forth in the "whereas" clause which states that Ohio National "propose[s] to have [broker-dealer's] registered representatives ("Representatives") who are, or will become, duly licensed insurance agents, solicit the sales of the Contracts." Exhs. A through E.

40.     As a result of issuing Annuities to Plaintiffs' customers, Ohio National had actual knowledge of the status of those customers as Ohio National annuitants.

41.     The Selling Agreements also require the broker-dealer to warrant that its sales representatives, including Plaintiffs, meet certain guidelines, including licensing requirements. The Selling Agreements obligate the broker-dealer to direct

and supervise the work of the sales representatives.

42.    The Selling Agreements state that commissions for the sale of these Annuities shall be paid to the broker-dealer based on the Commission Schedule "**in effect at the time that the Contract Payments are received**" by Ohio National. (emphasis added.)

43.    Said another way, Ohio National is obligated, pursuant to the Selling Agreements, to pay commissions for a particular Annuity as are set forth in the applicable Commission Schedule in effect *at the time the annuity is sold and Ohio National receives the customer's lump sum payment.*

44.    Finally, the Selling Agreements state that the terms of compensation shall survive the agreement unless the agreement is terminated for cause by Ohio National, and so long as the broker-dealer remains in good standing with appropriate regulatory agencies and is the broker-dealer of record for the account.

45.    Plaintiffs' broker-dealers remain in good standing.  Ohio National has made no attempt to, nor could it, assert that its cancellation of the Selling Agreements applicable here was for cause.

**B.    Sales Representatives are Intended Beneficiaries of the Selling Agreement.**

46.    While sales representatives such as Plaintiffs are not named parties to the Selling Agreements, the Selling Agreements make clear that they are intended beneficiaries of the contract.

12

47.    Ohio law incorporates Section 302 of the Second Restatement of Contracts with regard to intended beneficiaries under a contract.

48.    Under the Restatement, "[u]nless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either:  (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

49.    In Ohio, if the promisee intends that a third party should benefit from the contract, then that third party is an intended beneficiary who has enforceable rights under the contract.

50.    The specific provisions of the Selling Agreements that recognize Plaintiffs as direct third-party beneficiaries of the Ohio National Selling Agreements are numerous, and include the following:

   a.    The Selling Agreements expressly contemplate that those commissions paid to the broker-dealer pursuant to sales of Annuities would be passed on, at least in part, to the sales representatives themselves, including Plaintiffs. The Selling Agreements state "[c]ompensation to the broker-dealers

13

Representatives for Annuities solicited by the Representative and issued by ONL will be governed by an agreement between [broker-dealer] and its Representatives, and its payment will be the [broker-dealer's] responsibility." Exhs. A through E, at ¶ 9.

b.   The Selling Agreements explicitly contemplate that broker-dealers will delegate the marketing and sale of Annuities to their employees or other third-parties who will act as "Representatives" as set forth in the Selling Agreements. *See* Exhs. A through E, the "Whereas" clauses ("Whereas, [Ohio National] propose[s] to have BD's [broker-dealers'] representatives ("Representatives") who are, or will become, duly licensed insurance agents solicit sales of the Contracts".

c.   The Selling Agreements expressly acknowledge that commissions paid by Ohio National to the broker-dealers will pass through to these sales representatives, including Plaintiffs, according to a separate agreement between the broker-dealer and the sales representatives. *See id.* at ¶ 9 ("Compensation to the BD's Representatives for Contracts solicited by the Representatives and issued by [Ohio National] will be governed by agreement between BD and its Representatives and its

14

payment will be the BD's responsibility.").

d.   The Selling Agreements also expressly acknowledge that commissions paid by Ohio National to the broker-dealers will pass through to sales representatives, including Plaintiffs, by directing that, in states where express assignment of commissions is required, each broker-dealer would be required to "hereby assign *its representatives' commissions* to its affiliated insurance agency for those states." *Id.* (emphasis added).

e.   That the broker-dealers' sales representatives, including Plaintiffs, were express and intended direct beneficiaries of the Selling Agreements is further demonstrated by the fact that each Selling Agreement (with accompanying Addendum) refers to the Representatives more than twenty-five (25) times. *See* Exhs. A through E, *passim*.

f.   Each Selling Agreement's accompanying Commission Schedule also directly links the annual trailing commissions to the sales representatives', including Plaintiffs, "servicing the policies to [Ohio National's] satisfaction." *See* Exhs. A through E, Commission Schedules.

g.  The Commission Schedules accompanying the Selling Agreements also contain a chart from which the sales representatives, including Plaintiffs, could select different options for the form of payment of their pass-through commissions. More specifically, the Commission Schedules' charts reflect that the sales representatives, including Plaintiffs, could select to receive higher commissions on the initial premium payments for the Annuities and take lower percentages for the subsequent trailing commissions or vice versa. *See id.*

51.  Thus, the Selling Agreements clearly and expressly manifest an intention that sales representatives, such as Plaintiffs, will benefit from the Selling Agreements in the form of pass-through commissions, including trailing commissions. For this reason, Plaintiffs are third-party beneficiaries under the contracts.

52.  Any claim by Ohio National that sales representatives, including Plaintiffs, are somehow not third-party beneficiaries to the Selling Agreements is facially frivolous.

**C.   Plaintiffs Performed and Continue to Perform Valuable Services.**

53.  Plaintiffs and other sales representatives perform valuable services for which the trailing commissions represent compensation.

54.  Servicing a GMIB Annuity is complicated. A GMIB Rider affects,

16

among other things:  the amount of withdrawals allowed per year on the Contract; the timing of withdrawals; the timing of annuitization; and the expected return per year from the annuity contract.

55.     Deciding whether a GMIB Annuity should be surrendered or exchanged for another product is likewise complicated. Plaintiffs and other sales representatives provide valuable and necessary analysis and advice to annuitants regarding these and other matters.

56.     The trailing commissions also represent deferred compensation arising out of the sale of the Annuities.

**D.      Ohio National's Initial Attempts To Avoid Its Obligations Under the Selling Agreements.**

57.     After it determined that the GMIB Annuities were unprofitable and causing unacceptable financial bleeding, Ohio National initially sought to enlist its broker-dealers' sales representatives, including Plaintiffs, to help buy its way out of the situation by offering GMIB Annuity owners a "new" or alternative investment. Specifically, Ohio National tried to directly incentivize sales representatives to "sell" clients on the benefit of the proposed exchange to the new products by indicating that the representatives would get paid again for selling the alternative investment.

58.     Most of Plaintiffs' clients declined to make the exchange for the new products.

59.     Having failed to entice the majority of Plaintiffs' clients to make the

exchange voluntarily, Ohio National next devised a scheme to unilaterally stop paying trailing commissions due under the Selling Agreements to broker-dealers and their representatives, in an apparent attempt to increase the pressure on representatives to coerce clients to surrender and exchange the GMIB Annuities.

60.     This coercive scheme is comprised of several components addressed below, and is continuing.

### E.     Ohio National's Breach of Its Obligation to Pay Commissions Under the Selling Agreements.

60.     First, on September 21, 2018, Ohio National sent a letter to many or all of the broker-dealers with which it had a Selling Agreement, informing them that it was cancelling those agreements, effective December 12, 2018.  A specimen copy of that letter is attached as Exhibit F.

61.     As part of that letter, Ohio National also informed the broker-dealers it would no longer be paying trailing commissions, even on existing, valid Annuities.

62.     Ohio National provided no justification for this action. Moreover, Ohio National intends to continue to pay trailing commissions to its own captive broker-dealer's sales representatives with regard to the Annuities, among others.

63.     Pursuant to the terms of the Selling Agreements, Ohio National is obligated to pay trailing commissions to broker-dealers for all existing Annuities which are not surrendered or annuitized. While Ohio National may terminate the Selling Agreement, and thus end the ability of broker-dealers and sales

representatives to promote and sell new Annuities going forward, it may not unilaterally declare that it will not pay trailing commissions on Annuities that have already been sold and continue to be in force and are being serviced by sales representatives, including Plaintiffs.

64.     By announcing that it will cease paying trailing commissions as of December 12, 2018, Ohio National breached the Selling Agreements as to existing Annuities that have not been surrendered or annuitized.

65.     Pursuant to Ohio National's announced policy, Plaintiffs will not receive any trailing commissions due them as third-party beneficiaries of the Selling Agreements after December 12, 2018, even if Plaintiffs continue to provide advice and recommendations to their customers who own Annuities. As such, Plaintiffs are damaged as a result of Ohio National's breach of the Selling Agreements.

**F.     Ohio National's Post-Breach Conduct**

66.     After its announcement that it would breach the Selling Agreements as of December 12, 2018, Ohio National next sent the broker-dealers offers to sign a proposed new "Servicing Agreement" that, for all non-GMIB Annuity Contracts, provided for payment to the broker-dealers of a "servicing fee" for servicing the non-GMIB Annuity Contracts, in an amount equal to the commissions owed under the Selling Agreements.  A specimen copy of that letter is attached as Exhibit G.

67.     In addition, Ohio National then decided to contact clients directly to

convince them to surrender and exchange their GMIB Annuities. Ohio National

notified its broker-dealers and sales representatives as follows:

> From November 12, 2018 through February 11, 2019, Ohio National is
> offering the opportunity for eligible clients to participate in a Buyout
> offer of their…variable annuity contract with Guaranteed Minimum
> Income (GMIB) rider.   By accepting this offer, clients will be
> cancelling their variable annuity contracts and all attached rider in
> exchange for an Enhanced Contract Value, which they may receive as
> a cash surrender or transfer to a financial product available from another
> financial institution.

(the "Buyout Offer").   A specimen copy of that notice is attached hereto as Exhibit

H.

68.     In the same email, Ohio National made it clear that it was going to go

directly to the clients with the Buyout Offer:  "The following items accompany this

letter:  A list of clients eligible for the offer[;] A sample letter your eligible client

will receive[;] a copy of the GMIB  Buyout Offer Acceptance form[.]" *See* Buyout

Offer Documents, attached hereto as Exhibit I.

69.     Ohio National's illicit attempts to strong arm Plaintiffs, their broker-

dealers, and their clients into these Buyouts not only unlawfully cuts off payment of

trail commissions owed to Plaintiffs under the Selling Agreements, but also appears

designed to pressure Plaintiffs and their broker-dealers to counsel their clients to

surrender their GMIB Annuities or purchase other financial products not necessarily

in the clients' best interests, and to cause Plaintiffs and their broker-dealers to

provide less service to GMIB Annuity clients, since they will not be compensated

for such service, so that Ohio National will get what it seeks—the surrender of the costly GMIB Annuities.

## V.    CAUSES OF ACTION

### Count One: Breach of Contract–Third Party Beneficiary

70.    Plaintiffs reallege each and every allegation contained in the paragraphs set forth above as if fully set forth herein.

71.    Ohio National has a contractual relationship with broker-dealers via the Selling Agreements, under which Ohio National is obligated to pay trailing commissions on active Annuities.

72.    Pursuant to those Selling Agreements, some portion of those commissions pass through to sales representatives such as Plaintiffs.  As such, Plaintiffs are third-party beneficiaries of the Selling Agreements on active Annuities.

73.    In its September 21, 2018 letter, Ohio National announced that as of December 12, 2018, it would no longer pay trailing commissions on active Annuities. In so doing, Ohio National breached the Selling Agreements.

74.    To the extent that Ohio National's actions constitute an anticipatory, rather than a present breach, under Ohio law, upon an anticipatory breach, the injured party may sue the breaching party prior to the time that the breach is complete.

75.    Plaintiffs have been and will be damaged by Ohio National's conduct, in that they will not receive pass-through trailing commissions to which they are

entitled flowing from the Selling Agreements and the related Schedules of Commissions.

76.     Plaintiffs seek monetary damage stemming from Ohio National's breach of the Selling Agreements and their related Schedules of Commissions.

77.     Plaintiffs also seek specific performance of the Selling Agreements and the related Schedules of Commissions, which obligate Ohio National to pay trailing commissions on Annuities as long as those Annuities are active.

### Count Two:  Unjust Enrichment

78.     Plaintiffs reallege each and every allegation contained in the paragraphs set forth above as if fully set forth herein, with the exception of the paragraphs above regarding breach of contract.  This claim is brought in the alternative to the breach of contract claim.

79.     Ohio National received a benefit, in the form of proceeds stemming from the sale of the Annuities. Some portion of those proceeds were to be passed back to Plaintiffs in the form of trailing commissions.

80.     By announcing that it would cease paying trailing commissions on active Annuities, Ohio National will and has retained the benefits of its unlawful conduct. Due to Ohio National's conduct alleged herein, it would be unjust and inequitable under the circumstances for Ohio National to be permitted to retain the benefit of its wrongful conduct.

81.      Plaintiffs are entitled to restitution and/or damages from Ohio National and/or an order of this Court proportionally disgorging all profits, benefits, and other compensation obtained by Ohio National from its wrongful conduct. If necessary, the establishment of a constructive trust from which Plaintiffs may seek restitution or compensation may be created.

82.      Additionally, Plaintiffs may not have an adequate remedy at law against Ohio National, and accordingly plead this claim for unjust enrichment in the alternative to other claims pleaded herein.

### Count Three:  Tortious Interference with Business Relations

83.      Plaintiffs reallege each and every allegation contained in paragraphs 1-69 as if fully set forth herein.

84.      Plaintiffs have a business relationship with their broker-dealers, under which, *inter alia*, Plaintiffs would receive pass-through trailing commissions stemming from active Annuities.

85.      Ohio National was and is aware of the nature of these relationships, as the Selling Agreements explicitly state that they would pay commissions to the broker-dealers, who would in turn pass some portion of those commissions on to the sales representatives engaged in the sale of the Annuities, including Plaintiffs.

86.      By announcing that it would not pay, and refusing to pay, trailing commissions to the broker-dealers pursuant to the Selling Agreements and the

related Schedules of Commissions, Ohio National intentionally and wrongfully caused the pass-through arrangements between the broker-dealers and Plaintiffs to be terminated.

87.     As a result of its intentional action, Plaintiffs have suffered damages in the form of lost pass-through trailing commissions that they would otherwise receive pursuant to the pass-through arrangements and future trailing commissions.

88.     There was no justification for this action and this action was not privileged.

## Count Four:  Promissory Estoppel

89.     Plaintiffs reallege each and every allegation contained in paragraphs 1-69 as if fully set forth herein. This promissory estoppel claim is brought in the alternative to the breach of contract claim set forth in paragraphs 70-77.

90.     Ohio National promised to make payments, including trailing commissions, to broker-dealers, which would, in turn, be passed on in large part to sales representatives, including Plaintiffs.

91.     Ohio National reasonably expected that the promise of such payment would induce action on the part of broker-dealers and sales representatives, including Plaintiffs, in the form of soliciting sales of Ohio National Annuities.

92.     The promise of such payment did, in fact, induce such action on the part of broker-dealers and sales representatives, including Plaintiffs.

93.     Plaintiffs justifiably relied on the representation of Ohio National that those commissions would be forthcoming

94.     Injustice can only be avoided by enforcement of Ohio National's promise to pay all commissions, including trailing commissions.

### Count Five:  Declaratory Relief Pursuant to 28 U.S.C. § 2201

95.     Plaintiffs reallege each and every allegation contained in paragraphs 1-69 as if fully set forth herein.  This claim for declaratory relief is brought in the alternative to the breach of contract claim set forth in paragraphs 70-77.

96.     An actual controversy has arisen and now exists between Plaintiffs on the one hand, and Ohio National on the other, concerning Ohio National's obligation to pay trailing commissions pursuant to the Selling Agreements and the related Schedules of Commissions.  Ohio National has stated that it will no longer honor those Selling Agreements and pay the commissions as set forth in the Schedules of Commissions.

97.     Accordingly, Plaintiffs are entitled to seek a judicial determination of whether Ohio National is obligated to pay trailing commissions for all active Annuities.

98.     A judicial determination of the rights and responsibilities of the parties with regard to the Selling Agreements and the related Schedules of Commissions is necessary and appropriate at this time so that: (1) the rights of the Plaintiffs and Ohio

National may be determined with certainty for purposes of resolving this action; and (2) the Parties will have an understanding of Ohio National's obligations in the future, given its continuing legal obligations and ongoing relationship with Plaintiffs.

## VI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.   An award of monetary actual and punitive damages and/or restitution, as appropriate;

B.   An award of prejudgment interest to the extent allowed by the law;

C.   An award of all experts' fees, attorneys' fees, expenses, and costs of prosecuting this action; and

D.   Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMAND

Plaintiffs request a trial by jury pursuant to Federal Rule of Civil Procedure 38.

Respectfully submitted,

*/s/ Andrew P. Campbell*
Counsel for Plaintiffs

**OF COUNSEL:**

Andrew P. Campbell
Todd Campbell
Campbell Partners, LLC
505 20th Street N., Suite 1600
Birmingham, AL 35203
Andy@campbellpartnerslaw.com
todd@campbellpartnerslaw.com

Jonathan H. Waller
Waller Law Office, PC
2001 Park Place, Suite 900
Birmingham, AL 35203
jwaller@waller-law.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2019, I electronically filed the foregoing with the Clerk of Court via the CM/ECF system which will send notification of such filing to the following counsel of record:

Brad A. Everhardt
Robert W. Bradford
Hill, Hill, Carter, Franco,
Cole & Black, P.C.
P.O. Box 116
Montgomery, AL 36101
beverhardt@hillhillcarter.com
rwbradford@hillhillcarter.com

*Counsel for Defendants*

*/s/ Andrew P. Campbell*
Of Counsel
